UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

SHIFT CAPITAL, INC.

     Plaintiff,                               Case No:

vs.

ATIF BAWAHAB, IINN, INC.,
INSIGHT MANAGEMENT AND
CONSULTING SERVICES, INC., and
INSIGHT MOBILITY, LLC

_____/

## COMPLAINT

Plaintiff Shift Capital, Inc. ("Shift"), by and through its undersigned counsel, files this Complaint against defendants Atif Bawahab ("Bawahab"), IINN, Inc. ("IINN"), Insight Management and Consulting Services, Inc. ("Insight Management") and Insight Mobility, LLC ("Insight Mobility") (IINN, Insight Management, and Insight Mobility are referred to collectively herein as the "Insight Companies").

### THE PARTIES

1.      Shift is a Florida corporation with its principal place of business at 7950 North West 53rd Street, Suite 337, Doral, Florida 33166.

2.      Bawahab is an individual who, upon information and belief, resides in Michigan.

3.      IINN is a Michigan corporation with its principal place of business at 4800 South Saginaw Street, Flint, Michigan 48507.

4.      Insight Management is a Michigan limited liability company with its principal place of business at 4800 South Saginaw Street, Flint, Michigan 48507

5.      Insight Mobility is a Michigan limited liability company with its principal place of business at 4800 South Saginaw Street, Flint, Michigan 48507.

## JURISDICTION AND VENUE

6.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(l) because there is diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest, costs, and attorney's fees. More specifically:

(a)      Shift is a citizen of Florida.

(b)      Bawahab is, upon information and belief, a citizen of Michigan.

(c)      IINN and Insight Management are, upon information and belief, citizens of Michigan.

(d)      Upon information and belief, no member or owner of Insight Mobility, LLC is a citizen of, or resides in, Florida.

7.      Defendants are subject to the personal jurisdiction of this Court because they have voluntarily subjected themselves to the jurisdiction of this Court and/or have purposefully availed themselves of the jurisdiction of this Court with respect to the specific transactions at issue. More specifically:

(a)      In the June 14, 2024 written agreements, which are relevant to the claims at issue in this action, Shift and Defendants acknowledged and agreed, *inter alia*, that (i) the agreements were "made in the State of Florida," (ii) "the State of Florida has a reasonable relationship to the transactions encompassed by [the agreements]," and (iii) "[a]ny litigation, whether sounding in contract, tort, law, equity, or otherwise, relating to [the agreements] or involving [Shift] on one side and [the Insight Companies] or [Bawahab] on

the other must be commenced and maintained in any court located in the Counties of Broward or Miami-Dade in the State of Florida."

(b)    Defendants committed a tortious act in Florida by way of communications directed into Florida for the purpose of fraud.

8.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this District.

ALLEGATIONS RELATED TO ALL CLAIMS

**The June 2024 Agreement**

9.    On or about March 12, 2024, Insight Management entered into a Hospital Facilities Management Services Agreement (the "Management Services Agreement") with CarePoint Health Systems, Inc. and several of CarePoint Health Systems, Inc.'s subsidiaries (collectively, "CarePoint").

10.    Pursuant to the Management Services Agreement, Insight Management agreed to provide various services and financial support to CarePoint.

11.    Bawahab signed the Management Services Agreement in his capacity as Chief Executive Officer ("CEO") of Insight Management.

12.    On June 14, 2024, Shift entered into a Standard Merchant Cash Advance Agreement (the "June 2024 Agreement") with CarePoint, the Insight Companies, and non-party Insight Chicago, Inc. ("Insight Chicago"), which upon information and belief, is an affiliate of the Insight Companies. The June 2024 Agreement is attached hereto as **Exhibit A**.

13.    The June 2024 Agreement contemplated that Shift would pay $4,500,000.00 to acquire $6,840,000.00 of CarePoint's, the Insight Companies', and Insight Chicago's future receivables.

3

14.     Bawahab signed the June 2024 Agreement on behalf of CarePoint, the Insight Companies, and Insight Chicago.

15.     Simultaneously with the execution of the June 2024 Agreement, Bawahab signed a Guarantee of Performance (the "Personal Guaranty") whereby he personally guaranteed CarePoint's, the Insight Companies', and Insight Chicago's "performance of all of the representations, warranties, and covenants made by [CarePoint, the Insight Companies, and Insight Chicago] to [Shift]."

16.     Bawahab then directed Shift to send the purchase price to be paid under the June 2024 Agreement to an attorney escrow account presumably so it could be distributed to CarePoint and/or the Insight Companies, in line with the Management Services Agreement.

**The July 2024 Agreement**

17.     Just a few weeks after the June 2024 Agreement was signed, Bawahab's long-time friend and business associate, Omar Sharif Amanat ("Sharif"), approached Shift about the possibility of entering into a new funding agreement to replace the June 2024 Agreement.

18.     In negotiating toward a new agreement with Shift, Bawahab, Sharif, and other representatives of the Insight Companies expressed three main objectives: (a) they wanted the new agreement to pay off (*i.e.*, eliminate) the Insight Companies' obligations to Shift under the June 2024 Agreement; (b) they did not want any Insight-related entities to be parties to the new agreement; and (c) they did not want the new agreement to be secured by a personal guarantee.

19.     On July 3, 2024, Shift entered into a Standard Merchant Cash Advance Agreement (the "July 2024 Agreement") with CarePoint and Insight Chicago. Bawahab negotiated the July 2024 Agreement and signed on behalf of Insight Chicago and CarePoint. The July 2024 Agreement is attached hereto as **Exhibit B.**

20.     The July 2024 Agreement contemplated that Shift would pay $10,025,000.00 to acquire $15,679,100.00 of CarePoint's and Insight Chicago's future receivables, but that up to $6,280,080.00 of the purchase price would be retained by Shift to satisfy CarePoint's, the Insight Companies', and Insight Chicago's obligations under the June 2024 Agreement.

21.     After the July 2024 Agreement was signed, Shift retained $6,140,100.00 of the purchase price to satisfy CarePoint's, the Insight Companies', and Insight Chicago's obligations under the June 2024 Agreement.

22.     At Bawahab's instance, the July 2024 Agreement also did not include any personal guarantees.

23.     Put differently, as a result of the July 2024 Agreement, the obligations that the Insight Companies owed to Shift under the June 2024 Agreement, which Bawahab had personally guaranteed, were effectively transferred to CarePoint. [1]

24.     Once again, Bawahab directed Shift to send the purchase price to be paid under the July 2024 Agreement to an attorney escrow account presumably so it could be distributed to CarePoint.

**The Fraudulent Misrepresentations**

25.     Section 25 of the July 2024 Agreement, which Bawahab signed on behalf of CarePoint, includes the following representation:

> [CarePoint] represents, warrants, and covenants that as of the date of this Agreement, it **does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code** and there has been no involuntary petition brought or pending against [CarePoint]. [CarePoint] further warrants that it **does not anticipate filing any such bankruptcy petition** and it does not anticipate that an involuntary petition will be filed against it. (emphasis added).

---

[1] Shift is currently pursuing a claim for breach of the July 2024 Agreement against Insight Chicago, which has denied liability based on, *inter alia*, the theory of unilateral and/or mutual mistake.

26.     Upon information and belief, this representation was knowingly false when made. Indeed, soon after signing the July 2024 Agreement, CarePoint breached that agreement, and then filed bankruptcy in the United States Bankruptcy Court for the District of Delaware, Case No. 24-12534 (the "CarePoint Bankruptcy").

27.     Documents filed in the CarePoint Bankruptcy reveal that in July 2024, and perhaps even sooner, CarePoint was paying counsel for "prepetition services and expenses incurred . . . in connection with the preparation and commencement of [the CarePoint Bankruptcy]." CarePoint Bankruptcy, ECF No. 36-4.

28.     Further, in light of Insight Management's business relationship with CarePoint, Bawahab and the Insight Companies would have had insider knowledge of CarePoint's financial condition such that Bawahab and the Insight Companies knew or should have known that CarePoint was under financial stress and would file for bankruptcy soon after Bawahab signed the July 2024 Agreement on CarePoint's behalf.

29.     Section 22 of the July 2024 Agreement includes the following representation:

[CarePoint] represents, warrants, and covenants that it and each person signing this Agreement on behalf of [CarePoint] has full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

30.     Upon information and belief, this representation was knowingly false when made. Indeed, in documents filed by CarePoint in the CarePoint Bankruptcy, CarePoint made clear that:

Mr. Bawahab did not have the authority to incur debt to Shift Capital Inc. on behalf of [CarePoint] under the [Management Services Agreement], nor did he obtain such authority from [CarePoint's] Board of Trustees.

CarePoint Bankruptcy, ECF No. 744.

31.     In another filing in the CarePoint Bankruptcy, CarePoint also asserts that:

[I]n exchange for the [Management Services Agreement], [Insight Management] took additional [merchant cash advances] out to refinance the [merchant cash

advances received by CarePoint prior to the Management Services Agreement] off CarePoint's books. CarePoint is not aware of any [merchant cash advances] remaining on its books. CarePoint believes the [merchant cash advances] have balances remaining which have been assumed by [Insight Management] and that CarePoint is not responsible for the repayment of these [merchant cash advances].

CarePoint Bankruptcy, ECF No. 1131.

32.     Upon information and belief, Bawahab and the Insight Companies engaged in a fraudulent scheme to enter into the July 2024 Agreement in order to transfer their liability to CarePoint and did so with the knowledge that CarePoint was under financial stress and would soon file for bankruptcy.

### FIRST COUNT
### (Fraudulent Inducement)

33.     Shift repeats and realleges each of the allegations contained in the paragraphs above as if fully set forth herein.

34.     The representations set forth in paragraphs 25 and 29 of this Complaint (the "Fraudulent Misrepresentations") were false.

35.     The Fraudulent Misrepresentations concerned material facts.

36.     But not for the Fraudulent Misrepresentations, Shift would not have entered into the July 2024 Agreement.

37.     At the time they made the Fraudulent Misrepresentations, Defendants knew the Fraudulent Misrepresentations were false.

38.     Defendants made the Fraudulent Misrepresentations for the purpose of inducing Shift to enter, and perform on, the July 2024 Agreement.

39.     Shift relied on the Fraudulent Misrepresentations to its detriment.

40.     As a direct and proximate result of the Fraudulent Misrepresentations, Shift sustained monetary damages in amount not less $14,439,812.00.

7

### SECOND COUNT
### (Unjust Enrichment – In the Alternative)

41.     Shift repeats and realleges each of the allegations contained in the paragraphs above as if fully set forth herein.

42.     By entering into the July 2024 Agreement, Shift conferred benefits on Defendants in that, *inter alia*, (a) the Insight Companies were released from $6,140,100.00 in payment obligations under the June 2024 Agreement; (b) Bawahab was released from his obligations under the Personal Guaranty; (c) Shift transferred $2,005,952.00 to the Insight Companies pursuant to the July 2024 Agreement.

43.     Defendants were aware they were receiving benefit from Shift, and Defendants voluntarily accepted and retained those benefits.

44.     Under the circumstances, it would be inequitable for Defendants to retain the benefits without first paying Shift for the value of the benefits.

45.     Shift is entitled to recover no less than $8,246,052.00 from Defendants.

### PRAYER FOR RELIEF

46.     Wherefore, Shift demands judgment against Defendants, jointly and severally:

(a)     awarding Shift $14,439,812.00, plus interest, costs and attorneys' fees;

(b)     in the alternative, awarding Shift $8,246,052.00, plus interest, costs and attorneys' fees; and

(c)     awarding Shift other relief this Court deems just and proper.

108294301.2

Dated: January 20, 2026

Respectfully submitted,

**POLSINELLI PC**
By: */s/ Marx P. Calderón*
Michelle G. Bernstein
Florida Bar No. 1030736
Marx P. Calderón
Florida Bar Number 1065228
315 S. Biscayne Blvd., Suite 400
Miami, FL 33131
Telephone: (305) 921-1825
mbernstein@polsinelli.com
mcalderon@polsinelli.com

108294301.2